UNITED STATES DISTRICT COURT

Northern District Of California

San Francisco Division

LEONARD REY OLIVER JR.,

        Plaintiff,

    v.

MICHAEL ASTRUE,

        Defendant.

No. C 11-04354 LB

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT, AND REMANDING FOR FURTHER CONSIDERATION**

**[Re: ECF Nos. 12, 14]**

## INTRODUCTION

Plaintiff Leonard Rey Oliver Jr. moves for summary judgment, seeking judicial review of a final decision by defendant Michael Astrue, the Commissioner of Social Security Administration (the "Commissioner"), denying him Social Security Income ("SSI") disability benefits for his claimed learning disability.[1]  Pl.'s Mot., ECF No. 12;[2] AR 23, 87.  The Administrative Law Judge ("ALJ") determined that Mr. Oliver could not perform his past relevant work but could perform

[1]  The ALJ also considered Personality Disorder and "possible" Borderline Intellectual Functioning in its review of Mr. Oliver's disability claim.  AR 25.

[2]  Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-generated page numbers at the top of the document, not the pages at the bottom.

United States District Court
For Northern District of California

United States District Court
For Northern District of California

1  unskilled work that requires no more than 4th grade-level reading or more than 6th grade-level

2  math with no public contact and only occasional interaction with co-workers. AR 31, 34. In

3  holding that Mr. Oliver had not been under a disability, as defined in the Social Security Act,

4  from January 1, 2007 through the date of the decision, the ALJ reasoned that Mr. Oliver was

5  capable of performing other jobs such as a hand packager, landscape laborer, and housekeeper

6  that all existed in significant numbers in the national economy. AR 35-36.

7      Mr. Oliver also seeks a remand to the ALJ to consider a new diagnosis of Asperger's Disorder

8  that he presented to the Appeals Council. Pl.'s Mot., ECF No. 12 at 15-20. The Appeals Council

9  did not consider it on the ground that it was "about a later time." AR 1-2. On remand, Mr. Oliver

10 also wants the ALJ to consider a new opinion from a Medi-Cal ALJ remanding to the county to

11 consider the Asperger's Disorder diagnosis. Pl.'s Mot., ECF No. 12 at 15.

12     Pursuant to Civil Local Rule 16-5, the matter is deemed submitted for decision by this court

13 without oral argument. All parties have consented to the court's jurisdiction. ECF Nos. 5, 7. For

14 the reasons stated below, the court **GRANTS** Mr. Oliver's motion for summary judgment,

15 **DENIES** the Commissioner's cross-motion for summary judgment, and **REMANDS** this case to

16 the Administrative Law Judge to consider the treating internist's medical opinion, the Alameda

17 County medical records, and the Medi-Cal decision.

18                                          **STATEMENT**

19 **I. PROCEDURAL HISTORY**

20     On July 31, 2007, Mr. Oliver, now 52 years old, filed his applications for disability insurance

21 benefits and supplemental security income under Titles II and XVI of the Social Security Act.

22 AR 83, 139, 143. The Commissioner denied his applications both initially and upon

23 reconsideration. AR 87-91, 96-100. On April 28, 2008, Mr. Oliver timely requested a hearing

24 before an ALJ. AR 23. An ALJ conducted a hearing on September 23, 2009 in Oakland,

25 California. AR 41-82. Mr. Oliver appeared with his attorney, Glenn M. Clark, and testified at the

26 hearing along with vocational expert Alan Nelson (the "VE"). AR 41.

27

28

C 11-04354 LB
ORDER

The ALJ issued a decision on February 11, 2010 and found that Mr. Oliver was not disabled because he was capable of performing other jobs that existed in significant numbers in the national economy even if he could not perform his past relevant work.  AR 34-36.

Mr. Oliver timely requested that the Appeals Council review the ALJ's decision.  AR 17. While Mr. Oliver's claim was pending before the Appeals Council, he submitted new medical records with a diagnosis of Asperger's Disorder from the Alameda County Behavioral Health Care Services ("Alameda County") dated from July 13, 2010 to November 2, 2010.  The Appeals Council denied Mr. Oliver's request for review initially and upon reconsideration.  AR 1, 6.  That denial rendered the ALJ's February 11, 2010 decision the Commissioner's final decision.  AR 1.

Mr. Oliver filed a complaint for judicial review under 42 U.S.C. § 405(g).  Compl., ECF No. 1.  Mr. Oliver and the Commissioner both now move for summary judgment.  Pl.'s Mot., ECF No. 12; Comm'r's Opp'n and Cross-mot., ECF No. 14.

## II. SUMMARY OF RECORD AND ADMINISTRATIVE FINDINGS

This section summarizes (A) the medical evidence in the administrative record, (B) other opinion evidence in the administrative record, (C) the vocational evidence in the administrative record, (D) the vocational expert's testimony, (E) testimonies from Mr. Oliver and Mrs. Johnson, (F) the ALJ's findings, (G) the Appeals Council's decision to reject new medical evidence, and (H) the Medi-Cal proceedings

### A. Medical Evidence

#### 1. Dr. Riley on 09/12/06 and 11/14/07

In September 12, 2006, Mr. Oliver completed a cognitive assessment under Dr. Riley and obtained the following scores: Full Scale IQ of 79, Verbal IQ of 76, Performance IQ of 87, Perceptual/ Organization Index of 93, and Verbal Comprehension Index of 78.  AR 328.  Mr. Oliver showed an average range in visual/nonverbal abstract reasoning while his verbal abstract reasoning was in the borderline range.  AR 333.

United States District Court
For Northern District of California

1    The Department of Rehabilitation referred Mr. Oliver to Dr. Riley again on November 14,

2  2007, because Mr. Oliver "displayed inappropriate verbal behaviors that seriously impeded his

3  ability to benefit from DOR services." AR 328.

4    Dr. Riley noted Mr. Oliver's mental status in his November 2007 report. AR 330. He stated

5  that Mr. Oliver's "concentration ability was grossly adequate as he was able to do 4 of 6 Serial 7

6  items in 30 seconds." AR 330. In finding that Mr. Oliver's "gross judgment appeared adequate,"

7  Dr. Riley noted that Mr. Oliver responded appropriately to hypotheticals about how he would

8  react if he found a lost child or if he were the first person to notice a fire in a movie theater. AR

9  330. In addition, Dr. Riley reported that Mr. Oliver "stated his mood was 'OK I guess'" but that

10  Mr. Oliver also complained that "he had a tendency to get easily frustrated and he currently feels

11  frustrated because he is out of work." AR 330.

12    Dr. Riley performed a series of assessments on Mr. Oliver. AR 330-31. For the Bender-

13  Gestalt Test, Dr. Riley stated that Mr. Oliver "does not appear to have neurological symptoms."

14  AR 330. As for the MCMI-II Profile, Dr. Riley found that Mr. Oliver's highest score was on the

15  Dependent Personality Scale, suggesting a "pervasive and excessive need to be taken care of that

16  leads to submissive and clinging behavior and fears of separation." AR 330-31. Moreover, Dr.

17  Riley stated that these individuals "may have difficulty making every day decisions without

18  reassurance from others and needs others to assume responsibility for major life areas." AR 331.

19  Dr. Riley also noted the other scales that "approached significance" on the MCMI-II Profile were

20  Self-defeating, Narcissistic, Antisocial, and Depressive scales. AR 331. In interpreting these

21  scales, Dr. Riley explained that these results may indicate that Mr. Oliver is a "tough-minded

22  individual who lacks empathy for others, has a pessimistic view of the world and a tendency to be

23  masochistic." AR 331.

24    In describing Mr. Oliver's Rorschach Profile, Dr. Riley stated that the most notable result in

25  Mr. Oliver's "profile is a mild, but chronic state of stimulus overload resulting from a lack of

26  psychological resources to cope with the demands of his environment." AR 331. Dr. Riley

27  further elaborated that "[s]uch individuals are at risk for episodes of high anxiety, tension, or

28

4

United States District Court
For Northern District of California

1  irritability" and "may have emotional outbursts and impulsive actions." AR 331. In qualifying

2  his findings, Dr. Riley stated that Mr. Oliver's level of overload is only mild so "he may not feel

3  this stress." AR 331. In addition, Dr. Riley stated that Mr. Oliver is likely to overvalue himself

4  and place his own needs over others, but he is also "more strongly committed than most people to

5  being agreeable and establishing harmonious relationships when he does interact with others."

6  AR 331.

7  In describing Mr. Oliver's Rorschach Profile, Dr. Riley elaborated on Mr. Oliver's intelligence

8  as well as his ability to conform to situations. AR 332. Dr. Riley highlighted surprisingly

9  positive results as well as results indicating a serious impairment of reality testing abilities. AR

10  332. In relevant part, Dr. Riley explained:

> The quality of his effort to focus his attention with precision and to synthesize
> aspects of his experience exceeds that of most people. This is surprising
> considering his low level of intelligence. It may be that he has cognitive capacities
> that, for various reasons, have not been able to translate fully into traditionally
> measured intelligence or academic achievement. He is about as capable as most
> people of cognizing conventional modes of response and of conforming to
> situations which are well structured and clear. He demonstrates a serious
> impairment of his reality testing abilities, however, and tends to misperceive
> events [and] have distorted impressions of people and what their actions signify.
> This confusion appears to constitute a chronic and pervasive source of
> maladjustment. It is likely to cause difficulty maintaining adequate adjustment for
> long periods of time in most situations. Such individuals may have a psychotic
> degree of disturbance. He tends to be a rigid individual who holds firmly to his
> convictions despite the evidence. He appears to have a mild to moderate
> impairment as to his ability to think logically and coherently.

21  AR 332.

22  Even though Dr. Riley found that there were "signs of a psychotic degree of personality

23  disturbance and some disordered thinking," indicating a psychotic disorder, Dr. Riley concluded

24  that the more likely diagnosis is "a personality disorder with distortion of the understanding of the

25  behaviors of others and cognitive and emotional immaturity." AR 332. Consequently, Dr. Riley

26  diagnosed Mr. Oliver with Personality Disorder NOS with Dependent, Narcissistic and Self-

27  Defeating Features, and Borderline Intelligence. AR 333. In diagnosing Mr. Oliver, Dr. Riley

28

5

United States District Court
For Northern District of California

1   suggested that supportive psychotherapy and behavioral therapy may prove helpful to Mr. Oliver

2   so that he can increase his social skills and independence and obtain a better understanding of

3   other people's behaviors.  AR 333.

4       ***2. Dr. Sokkary on 09/25/06***

5     Mr. Oliver was referred to Dr. Sokkary, a clinical psychologist.  AR 292.  Dr. Sokkary

6   administered several exams on Mr. Oliver in a single, time-limited session on September 25,

7   2006.  AR 292.  Mr. Oliver obtained the following Wechsler Adult Intelligence Scale-Third

8   Edition (WAIS-III) scores: Verbal IQ of 89, Performance IQ of 111, and a Full Scale IQ of 98.

9   AR 291.  Dr. Sokkary indicated that Mr. Oliver's "overall clinical presentation is of an individual

10   with average cognitive abilities, with symptoms of adjustment disorder."  AR 292.  On the

11   Wechsler Memory Scale III (WMS-III), Dr. Sokkary reported that Mr. Oliver's "immediate and

12   delayed verbal memories were below limits while immediate visual memory results were all

13   within normal limits."  AR 292.  In addition, Mr. Oliver's Bender Gestalt-II results suggested that

14   he has "average visual motor integration abilities that are within normal limits."  AR 292.

15     With a Full Scale IQ of 98, Mr. Oliver reflects an intellectual functioning in the average

16   range.  AR 291.  Dr. Sokkary opined that "[t]here is a 95% chance that his true IQ falls in the

17   range 94-102."  AR 291.  In particular, Dr. Sokkary noted that Mr. Oliver's "unique set of

18   thinking and reasoning abilities makes his overall intellectual functioning difficult to summarize

19   by the Full Scale IQ on the WAIS-III because there are large discrepancies between the scores

20   that compose either the Verbal scale or the Performance scale."  AR 291.  As such, Dr. Sokkary

21   found that Mr. Oliver's "performance may be more appropriately described by the separate scores

22   contributing to the Verbal scale or the Performance scale."  AR 291.

23     Dr. Sokkary diagnosed Mr. Oliver with average cognitive abilities and symptoms of

24   adjustment disorders.  AR 292.  In the report's "Medical Source Statement," she stated that Mr.

25   Oliver "demonstrates a capacity to understand, remember, and perform moderately difficult

26   tasks."  AR 292.  Moreover, Dr. Sokkary reported that Mr. Oliver "was able to maintain a

27   sufficient level of concentration, persistence and pace to do basic to moderately complex work in

28

6

United States District Court
For Northern District of California

1   an environment that health condition would allow."  AR 292.  She also found that Mr. Oliver was

2   "cooperative throughout the evaluation and was capable of adequately communicating and

3   therefore would be able to appropriately interact with supervisors and co-workers at this time."

4   AR 292.

5       **3.  Dr. Howard on 10/09/07**

6       Dr. Howard, a licensed psychologist, performed a brief, one-time examination of Mr. Oliver

7   in October 2007.  AR 313.  He conducted several examinations on Mr. Oliver.  AR 311-13.

8       First, on the Bender-Gestalt, Mr. Oliver performed poorly and received a score of 10.  AR

9   312.  Scores above 10 suggest that an individual has significant impairments.  AR 312.

10      Second, on the WAIS-III Scale, Mr. Oliver also performed poorly, resulting in a Full Scale IQ

11  of 62, Verbal IQ of 66, and Performance IQ of 63.  AR 312.  Dr. Howard indicated that these

12  scores placed Mr. Oliver in the Extremely Low range of intelligence.  AR 312.

13      Third, on the Trail Making Tests, Mr. Oliver's scores showed that he has a "slowed

14  psychomotor ability" and "difficulty shifting mental sets."  AR 312.  With one error in both of the

15  Trail Making Tests, Mr. Oliver completed Part A in 47 seconds and Part B in 170 seconds.  AR

16  312.  Dr. Howard noted, "[e]rrorless scores over 151 on Part B are strongly suggestive of

17  individuals with deficits."  AR 312.

18      Fourth, on the WMS-III, Mr. Oliver placed in the Extremely Low range in both the Immediate

19  Visual Memory scale with a score of 61 and Working Memory scale with a score of 63.  AR 313.

20  Dr. Howard reported that Mr. Oliver's "ability of immediate memory and his ability of attention

21  and concentration appeared impaired."  AR 313.

22      Dr. Howard concluded with the following diagnostic impressions: "Mood Disorder, NOS,

23  with anxious features; Cognitive Disorder NOS, Polysubstance dependence, in remission (by

24  claimant's report);" and a Global Assessment of Functioning Scale (GAF) of 55.  AR 313.  Due to

25  Mr. Oliver's level of functioning and mood disorder, Dr. Howard reported that Mr. Oliver will

26  likely have "marked to extreme difficulty performing detailed and complex tasks, marked

27  difficulty performing simple and repetitive tasks, difficulty performing work activities without

28

7

United States District Court
For Northern District of California

special or additional supervision, and difficulty dealing with the usual stresses encountered in competitive work." AR 313.

### 4. Internist on 05/08

On May 16, 2008, an internist reported that his or her diagnosis or impression of Mr. Oliver was that he had a learning disability or cognitive delays. AR 353. In addition, the internist checked a box indicating that Mr. Oliver is chronically unemployable due to poor comprehension and communication. AR 354. Furthermore, the internist stated that Mr. Oliver has had difficulties maintaining employment for many years due to "anger management issues." AR 353-54.

### 5. Dr. Watkins from 07/10 – 11/10 (provided only to Appeals Council)

Dr. Watkins treated Mr. Oliver from July to November 2010. Ex. A, ECF Nos. 12-1 at 6, 12-2 at 4, 7, 12-3 at 4, 12-4 at 7. Dr. Watkins reported that Mr. Oliver's GAF is 50. Ex. A, ECF No. 12-1 at 5. In addition to Asperger's Disorder, Dr. Watkins diagnosed Mr. Oliver with Borderline Intellectual Functioning and Personality Disorder NOS. *Id.* at 5. Furthermore, Dr. Watkins reported that Mr. Oliver's "psychotic symptoms, visual hallucinations, were very likely hypnogogic imagery, as they only occurred when he was very tired or falling asleep." *Id.* at 4.

### 6. Dr. Cotrufo from 07/10 – 11/10 (provided only to Appeals Council)

Dr. Cotrufo treated Mr. Oliver from July to November 2010. Ex. A, ECF Nos. 12-1 at 5, 12-3 at 1, 12-4 at 3. Dr. Cotrufo diagnosed him as "being mild autism of the Asperger's type." Ex. A, ECF No. 12-3 at 1. In addition, Dr. Cotrufo noted "r/o: malingering (for SSI)." Ex. A, ECF No. 12-1 at 5. In diagnosing Mr. Oliver, Dr. Cotrufo reported that Mr. Oliver "has social, obsessional and emotional issues consistent with Asperger's Syndrome." *Id.* at 7. Furthermore, Dr. Cotrufo noted that Mr. Oliver's "manneristic wiping of mouth with neck band of his t-shirt consistent with mild autism like what his Uncle had." *Id.* He also opined that Mr. Oliver is unaware that his abrupt and demanding "style" frightens people. Ex. A, ECF No. 12-2 at 1. This lack of awareness, Dr. Cotrufo explained, is due to Mr. Oliver's Asperger's Disorder, which "impairs his ability to empathize and socialize." *Id.*

8

**B. Other Opinion Evidence**

    *1. Ms. Williams*

Diana Williams, a social worker/health educator at the Native American Health Center, has been working with Mr. Oliver for a few years. AR 360. Ms. Williams acknowledged that Mr. Oliver has some remarkable strengths but indicated that she does not believe that he "will be able to find a job or live independently." AR 360-61. In particular, she noted that Mr. Oliver can be pleasant, nice, and conversant, but he can also be demanding and argumentative over small and big issues. AR 360-61. Even though she reported that he sometimes has "good recall," she stated that Mr. Oliver's "cognitive abilities are also obviously limited." AR 360. She believes that "Mr. Oliver is cognitively impaired, has a lower than average IQ, and suffers from a personality disorder that makes it difficult to have good relationships with people without arguing." AR 361.

    *2. State Agency*

In November 2007, Dr. Norbeck conducted a Psychiatric Review Technique pertaining to the period from January 1, 2007 to November 2, 2007. AR 314. In his report, Dr. Norbeck indicated that Mr. Oliver has the following medically determinable impairment: Cognitive Disorder, NOS; Mood Disorder, NOS; Organic Mental Disorder, and Affective Disorder. AR 315, 317, 320. Dr. Norbeck also noted that Mr. Oliver has the following functional limitations: no limitation in restriction of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. AR 322.

On the same day, Dr. Norbeck also completed a Mental Residual Functional Capacity Assessment. AR 325. Dr. Norbeck first found that Mr. Oliver is not significantly limited in his ability to remember locations and work-like procedures or ability to understand, remember, and carry out very short and simple instructions. AR 325. On the other hand, Dr. Norbeck found that Mr. Oliver is markedly limited in his ability to understand, remember, and carry out detailed instructions. AR 325. Other than a marked limitation with detailed instructions, Dr. Norbeck found that Mr. Oliver was either moderately or not significantly limited in his ability to adapt,

9

sustain concentration and persistence, and interact appropriately with the general public, coworkers, and supervisors.  AR 325-26.

### C. Vocational Evidence

#### 1. *Dr. Yoos from 09/04/07-09/06/07*

The California Department of Rehabilitation referred Mr. Oliver to Dr. Yoos, a vocational evaluator.  AR 183.  Dr. Yoos examined Mr. Oliver for three days and observed that he might be suffering from a personality disorder.  AR 183, 191, 193.  In the Vocational Evaluation and Career Planning Report, Dr. Yoos stated, "[p]rofessionally speaking, Leonard is observed to have much of the criteria that suggest he may be suffering from a personality disorder."  AR 183, 191. Dr. Yoos reported that, to his knowledge, Mr. Oliver had not gone to a psychiatric evaluation, and Mr. Oliver confirmed that he was not diagnosed with any condition.  AR 191.

During Dr. Yoos's assessment of Mr. Oliver, he conducted a Raven test, which "is a test of a person's capacity to apprehend two dimensional figures, see the relationships between them, conceive the nature of each figure completing each system, and, by so doing, develop a systematic method of reasoning."  AR 189.  In an untimed Raven test, Mr. Oliver scored in the 75th percentile, the average range.  AR 186, 189.  In the report's summary, Dr. Yoos reported that Mr. Oliver has an above average score in cognitive reasoning and challenges with communicating effectively.  AR 190.

Dr. Yoos also evaluated Mr. Oliver's vocational interest.  AR 188.  Mr. Oliver has a "probable success in 6 out of 14 possible career areas – Science-Professional, Outdoor, Business-Skilled, Clerical, Communication, Arts-Professional and Service-Skilled clusters."  AR 189.  The probabilities of success for those six careers were in the 10 percentile, except for Service-Skilled and Business-Skilled careers, which were in the 25 percentile.  AR 188-89.

In addition, Dr. Yoos found that Mr. Oliver's basic skills are at a very low academic level, finding that his testing showed spelling in the zero grade level, vocabulary in the fifth grade level, and reading comprehension in the third grade level.  AR 191.

10

United States District Court
For Northern District of California

1    Dr. Yoos also described some difficulties that Mr. Oliver would face in seeking and

2    maintaining employment as well as the type of work that Mr. Oliver would be capable of

3    performing.  AR 192.  As for difficulties, Dr. Yoos stated that Mr. Oliver needs assistance in

4    finding a job, completing job applications, and "advocacy with employers."  AR 192.

5    Furthermore, Dr. Yoos expounded that Mr. Oliver "will need retention services to help him with

6    how to communicate appropriately with workers and the supervisor, and how to handle conflict in

7    an effective manner, how to work with those who are from a different culture."  AR 192.  He

8    suggested that Mr. Oliver is capable of performing his past work and that he would be a good

9    candidate for employment at the Good Will, Thrift Town, or the Salvation Army "where he can

10    pick up items, sort them and organize them in the store."  AR 192.  Dr. Yoos also opined that Mr.

11    Oliver can act as a lot attendant for stores such as Safeway or Home Depot.  AR 192.

12        ***2.  Johansson on 09/15/06***

13    Charles B. Johansson, PhD, prepared a "Career Assessment Inventory – Enhanced Version

14    Interpreted Report" for Mr. Oliver.  AR 294.  The report is prepared to help participants decide

15    which career path to pursue by comparing the participant's interests to the interests of those who

16    are already employed in specific occupations.  AR 295-304.  It is based on research that shows

17    individuals being more satisfied with their occupation if their interests are similar to those who

18    are already employed in specific occupations.  AR 295-304.  Mr. Oliver scored highest in the

19    following occupations: card/gift shop manager, mail carrier, cafeteria worker, florist, truck driver,

20    and travel agent.  AR 304.

21    **C.  Vocational Expert Testimony**

22        ***1.  Mr. Nelson***

23    Mr. Nelson is the Vocational Expert (the "VE") who testified during the hearing and answered

24    hypotheticals that the ALJ and Mr. Oliver posed.  AR 74-78.  In responding to the ALJ's

25    hypothetical regarding an individual who has "the capacity to work at all exertional levels,

26    unskilled work, no public contact and only occasional coworker interaction required," the VE

27    responded that such an individual would not be able to perform any of Mr. Oliver's past jobs.  AR

28

11

United States District Court
For Northern District of California

74.  The VE explained that the contact with coworkers would be more than occasional in the fast food industry and being a security guard requires public contact.  AR 74.

The ALJ then asked, assuming the individual had the same age, education (including some of Mr. Oliver's special education), background, and experience as Mr. Oliver, who can perform unskilled work with no public contact and only occasional coworker interaction at all exertional strength, whether there are other jobs in the economy that the individual could perform.  AR 74. The VE stated that Mr. Oliver could work as a hand packer, DOT (#920.587-018), at SVP 2 and a medium exertional level, with 827,470 positions nationally and 5,490 locally; a landscape laborer, DOT (#408.687-014), at SVP 2 and a heavy exertional level with 924,330 positions nationally and 9,420 locally, or a housekeeper, DOT (# 325.687-014), at SVP 2 and a light exertional level, with 806,000 positions nationally and 5,050 locally.  AR 75.

Mr. Oliver's counsel then presented the VE with additional hypotheticals that included other alleged limitations coupled with the ALJ's hypothetical.  AR 76-78.

In the first situation, Mr. Oliver's counsel asked whether illiteracy would impact Mr. Oliver's ability to perform substantial gainful employment.  AR 76.  The VE did not find that illiteracy would impact Mr. Oliver's ability to perform the alternative jobs that the VE listed in response to the ALJ's hypothetical.  AR 76.

In the second situation, Mr. Oliver's counsel asked the VE if a marked impairment in taking directions would affect an individual's ability to be employed.  AR 77.  The VE replied, "Well, I don't think employment's going to be possible if it's a marked impairment.  I'm interpreting that as a severe problem that would require the individual to be in a special vocational setting that was more supervised than standard employment."  AR 77.

In the third situation, Mr. Oliver's counsel asked the VE if an individual who needs special services to help him communicate appropriately with coworkers and supervisor would be able to perform substantial gainful work.  AR 77.  The VE indicated that it would be "considered accommodating work" and therefore, he did not believe it would be possible for the individual to do substantial gainful work.  AR 77.

In the fourth situation, Mr. Oliver's counsel asked the VE if an individual "has marked impairment with the usual stresses encountered in competitive employment, so arguably that's shown also, would an individual be able to work if he had a marked impairment of dealing with the stress of usual employment." AR 78. The VE found that such an individual would not be able to work. AR 78. Mr. Oliver's counsel further opined that Mr. Oliver is clearly disabled and has marked impairment in Exhibit 3F, which is Mr. Johansson's Career Assessment Inventory report summarized above. AR 39, 77, 294-310.

**E. Witness Testimony**

### 1. Mrs. Johnson's testimony

During the ALJ hearing, Mr. Oliver's sister, Lynette Johnson, testified on the difficulty in taking Mr. Oliver to public places, because "he's very demanding on people." AR 65. For example, Mr. Oliver would "throw a fit" if a store refuses to take his expired coupons. AR 66. In addition, the family stopped taking Mr. Oliver to restaurants and alternatively, obtains take-outs to bring home, because "if he asks for, say a glass of water, he'll want no ice, and if it comes with then he starts yelling at the lady and calls her name and so forth." AR 66.

Mrs. Johnson also testified that Mr. Oliver requires supervision whenever he mows the grass or cuts something in the yard. AR 67. In demonstrating that Mr. Oliver requires supervision to conduct these activities, Mrs. Johnson testified that one example, particularly, frightened her. AR 67. She stated,

> "He got a chainsaw out, was going to cut a branch off, and it scared me, because I don't know that he handle those big items, you know, and my husband said well, maybe I should do that for you, and he threw a fit. You know, I can do it. I'm not stupid. We're not saying you are, but, you know, this is a dangerous machine, you know, and he didn't like that at all.

AR 67-68. Furthermore, Mrs. Johnson testified that Mr. Oliver has a temper and lacks social skills and patience. AR 68-69. She explained that Mr. Oliver was able to work in McDonald for a number of years, because he did not have to interact with people. AR 69. Mrs. Johnson opined, "[h]e was in the back of a McDonald's, and he was doing the fryers and mopping the

13

United States District Court
For Northern District of California

floors and stuff like that.  He wasn't actually dealing with people.  If he deals with people,

that's totally different.  He can't handle that."  AR 69.

### 2. Mr. Oliver's testimony

At the hearing, Mr. Oliver described his employment history and his interactions with other

employees.

Mr. Oliver worked from 1995 until 2002 at McDonald's.  AR 240.  He testified regarding an

incident with a coworker and explained that the incident was not a fight but "what they put down

on the paperwork."  AR 55-56.  He described the misunderstanding:

> It was really -- I put some fry baskets, oil, in the fries area, and the fry area had to --
> you're supposed to put the scoop on the side so you don't get hot oil in it.  That's what they
> told me yesterday.  The manager told -- that's when I felt later -- that I put oil on it and she
> got burned, and I thought she was hitting me and I was stopping her from hitting me, so
> we were going like this, and customers saw that.  Well, what's happened was she got
> burned, and I didn't know she got burned, but she don't speak English.  She's only -- what
> kind of language -- I think she was Chinese, so she was going like this.  She ran to the
> back of the area and put her hands in the cold, and I didn't hear that to after I left."

AR 56.  Following this incident at McDonald's, Mr. Oliver did not have any other substantially

gainful work.  AR 240.  After McDonald's, he worked at most six months for the following

employers: Adesa California, Hickory Farms, Chicken & Biscuits, Panda Express, Big A Drugs,

Spirit Halloween, Wal-Mart, Arvind Enterprises, and Target.  AR 242.

Mr. Oliver first served as Christmas help in 2003 at Hickory Farms.  AR 242.  He testified

that he sold merchandise to customers and "stocked the area" during the Christmas sale.  AR 49.

Mr. Oliver testified that he argued with a manager.  AR 49.  At the time of the argument, Mr.

Oliver did not know that the person he engaged in an argument with was a manager because that

person was not in the normal-manager uniform.  AR 49.  When Mr. Oliver found out, about a

month later, that the person he was arguing with was a manager, Mr. Oliver testified that the

manager "yelled at me and told me different things to do, and later on I just did didn't argue with

him anymore, but I got with him, so we just didn't say nothing or do nothing after that and I just

did my work and forgot about it."  AR 50.

United States District Court
For Northern District of California

C 11-04354 LB
ORDER

1    Three years later, Mr. Oliver again worked at Hickory Farms during Christmas. AR 50-51.

2    In responding to his counsel's question about whether he experienced any problems during his

3    second time working there, Mr. Oliver stated that he had difficulty filling out the paperwork to

4    ship packages and that he "usually had somebody else in the company do it." AR 51. Mr.

5    Oliver's counsel further inquired about whether he engaged in any arguments with anyone during

6    his second time at Hickory Farms, but Mr. Oliver was "not sure" and that lately, he "just try to do

7    the work, don't get in arguments with people if I just go around it." AR 51.

8    For Target, Mr. Oliver he testified that he mainly collected "baskets" (meaning, shopping

9    baskets). AR 242, 51. In addition to describing his responsibilities, Mr. Oliver testified as to the

10   reason why he no longer worked at Target. AR 51-52. He explained that "they" informed him

11   that he argued with a manager; however, he was not aware that he did so. AR 51. Mr. Oliver

12   further elaborated, "[t]hen I think a couple of weeks later they let me go because I was arguing

13   with the person and got angry." AR 51-52. He was unable to recall the reason for the argument.

14   AR 52. In fact, Mr. Oliver testified, "the only thing they told me was I argued with the

15   management, and I didn't even know I talked to that person at the time, so there is no way of

16   knowing what I did." AR 52.

17   For the calendar store, Mr. Oliver testified that he sold calendars to customers and placed the

18   calendars on the wall. AR 52. He also testified that he had difficulty returning the calendars in

19   the machine so he would seek help from a lady downstairs to return the calendars for him. AR

20   53. Furthermore, Mr. Oliver opined that he was unsure whether the calendar store would rehire

21   him. AR 53. He stated, "[t]he next year he didn't want to hire me, because he claimed that I took

22   his money from when I was on appointment, and he -- that's what he told me." AR 53.

23   For Wal-Mart, Mr. Oliver testified regarding the reason why he was let go. AR 53. He stated,

24   "[w]ell, they told me that they had jobs for the storm people and they let me go. That's the only

25   thing they told me. They didn't want -- need me no more. It's probably because I wasn't quick

26   enough, fast enough. That's what I figured." AR 53.

27

28

15

For Popeye's and Panda Express, Mr. Oliver testified that he was let go because they said he was not quick enough.  AR 54.

For Halloween Spirit, Mr. Oliver stocked costumes and provided numbers to customers who wanted to use the fitting room to try out costumes.  AR 54.   While employed at Halloween Spirit, Mr. Oliver argued with another woman and said he did not know that she was a manager.  AR 55. He testified that Halloween Spirit did not immediately fire him after the argument but his responsibilities changed.  AR 55.  Mr. Oliver stated, "[n]o, I think I just didn't talk to that person and I stayed longer by just putting all the -- the head manager told me to stock all the pallets on the wall and then -- so I would stay away from that person. . . ."  AR 55.

**F.  Summary of ALJ's Decision**

Applying the five-step sequential evaluation process, on February 11, 2010, the ALJ held that Mr. Oliver was not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act and therefore was not entitled to disability insurance benefits and supplemental security income. AR 23.

At step one, the ALJ found that Mr. Oliver had not engaged in substantial gainful activity since January 1, 2007, the alleged date in which Mr. Oliver became disabled.  AR 25.

At step two, the ALJ found that Mr. Oliver suffered from the following severe impairment: Personality Disorder and possible Borderline Intellectual Functioning.  AR 25.

At step three, the ALJ found that Mr. Oliver did not suffer from an impairment or combination of impairments that either was listed in the regulations or was medically equivalent to one of the listed impairments.  AR 29.

The ALJ then determined Mr. Oliver's residual functional capacity ("RFC") in order to assess at steps four and five whether he could perform his past relevant work or any other work considering his age, education, and work experience.  AR 31.  The ALJ found that Mr. Oliver had the RFC to perform a full range of work at all exertional levels but with nonexertional limitations. AR 31-34.  Specifically, the ALJ concluded that Mr. Oliver can perform unskilled work that

C 11-04354 LB
ORDER

requires no more than 4th grade-level reading or more than 6th grade-level math with no public contact and only occasional interaction with co-workers.  AR 31.

In making this RFC finding, the ALJ considered the symptoms and how consistent they were with the objective medical evidence (based on the requirements of 20 C.F.R. § 404.1529 and § 416.929 and Social Security Rulings 96-4p and 96-7p).  AR 31.  He also considered opinion evidence under 20 C.F.R. § 404.1527 and Social Security Rulings 96-2p, 96-5p, 96-6p, and 06-3p.  AR 31.  The ALJ followed a two-step process, first determining whether there was a medically-determinable physical or mental impairment that reasonably could be expected to produce Mr. Oliver's pain and symptoms, and then evaluating the intensity, persistence, and limiting effects of the symptoms to determine the extent that they limited Mr. Oliver's ability to do basic work activities.  AR 31.  For the second part, whenever Mr. Oliver's statements about the intensity or functionally limiting effects of pain or other symptoms were not substantiated by objective medical evidence, the ALJ made findings on the credibility of the statements based on "the entire case record."  AR 31.

The ALJ noted that Mr. Oliver alleged at the hearing that he was unable to work because of his argumentative nature and inability to comprehend basic instructions.  AR 31.  Then the ALJ described Mr. Oliver's testimony.  AR 31.  Mr. Oliver alleged that he has difficulties knowing when he does something improper at work.  AR 31.  This is evident from arguments he had at Target and Hickory Farms and that he was not aware of his behavior unless others informed him.  AR 31.  Furthermore, Mr. Oliver alleged that he was "let go" because he was not fast enough.  AR 31.  He worked at McDonald's for seven years; however, he was fired after an incident with another co-worker.  AR 31.  He also testified that others help him complete his job applications and that he has problems understanding non-English speakers.  AR 31.  Even though he can take the public transportation on his own, he does not go out because he becomes frustrated and angry.  AR 31.

The ALJ then described the testimony of Mr. Oliver's sister, Lynette Johnson.  AR 31-32.  Mrs. Johnson explained the difficulty in taking Mr. Oliver to public places, stating that Mr. Oliver

is very demanding with waiters in restaurants and throws fit in stores whenever the cashier refuses to take Mr. Oliver's expired coupons.  AR 31.  The ALJ also noted Mrs. Johnson's testimony regarding how Mr. Oliver requires supervision in performing yard work and how he cannot read, write, or expresses his feeling in a manner that third parties would understand.  AR 31-32.  She also asserted that Mr. Oliver's temper is shorter now and he becomes angry faster.  AR 32.

After recounting Mr. Oliver's and Mrs. Lynette's testimonies, the ALJ found that Mr. Oliver's "medically determinable impairment could reasonably be expected to cause some alleged symptoms" but found that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment."  AR 32.

The ALJ then turned to the issue of a mood and learning disorder.  AR 32.  The ALJ found that the record "suggests a history of a mood disorder and a learning disorder," but concluded that the record also reflects that Mr. Oliver's mental impairment do not prevent him "from performing basic work activities."  AR 32.  In so finding, the ALJ reviewed Dr. Sokkary's and Dr. Howard's opinions and noted that Mr. Oliver had not previously been "hospitalized secondary to a mental impairment."  AR 32.  The ALJ further observed that the record showed that Mr. Oliver was appropriately dressed during psychological assessment, and the evaluator found him alert, coherent, and oriented to person.  AR 32.  Mr. Oliver's eye contact was good, and his speech was fluid with a normal rate and volume.  AR 32.  In completing the assessment, Mr. Oliver required instructions to be repeated, and he also complained of memory loss.  AR 32.  Despite these problems, the ALJ noted that Mr. Oliver's visual memory results were normal and the Bender-Gestalt-II test further suggested average visual and motor integration abilities.  AR 32.

The ALJ found similar results in Dr. Riley's assessment of Mr. Oliver.  AR 32.  The ALJ observed that Dr. Riley reported Mr. Oliver as having a pleasant general demeanor and that Mr. Oliver was also oriented to persons, place, and time.  AR 32.  In addition, the ALJ noted that Dr. Riley's report showed that Mr. Oliver "knew who the current President, previous President, and Governor of California were."  AR 32.  Mr. Oliver completed 4 of 6 Serial 7 items in 30 seconds.

18

United States District Court
For Northern District of California

1    AR 32. As such, Dr. Riley reported that Mr. Oliver's concentration ability was grossly adequate

2    and that his gross judgment appeared adequate.  AR 32.  Furthermore, the ALJ noted that "Dr.

3    Riley stated although there were signs of a psychotic degree of personality disturbance and some

4    disordered thinking, they appear less likely."  AR 32.

5        The ALJ noted that Mr. Oliver did not show any limitations in daily living activities as a

6    result of mental impairment.  AR 32.  Moreover, the ALJ found that "Drs. Ahmed El-Sokkary and

7    Riley did not conclude that the claimant had psychological restrictions on his ability to work."

8    AR 32.  The ALJ elaborated that Drs. Sokkary and Riley reported that Mr. Oliver "was able to

9    maintain a sufficient level of concentration, persistence, and pace to do basic to moderately

10   complex work."  AR 32.

11       With regard to the psychiatric testing, the ALJ found that Mr. Oliver's results raised the

12   possibility that he may have been malingering or not fully cooperating.  AR 32-33.

13           On September 25, 2006, the claimant obtained a Full Scale IQ score of 98;
14           however, less than 1 year later on October 9, 2007, the claimant scored a Full
             Scale IQ score of only 62.  On September 25, 2006, the claimant's Verbal IQ and
15           Performance IQ sections were in the low average and a high average range of
             verbal and non-verbal intelligence, respectively, and his Full Scale IQ score
16           corresponded to an average range of intellectual functioning.  In addition on
             September 25, 2006, the claimant's picture completion, digit symbol-coding, block
17           design, matrix reasoning, vocabulary, similarities, arithmetic, digit span and
             information were each within the average range on the WAIS-III, and Dr. El-
18           Sokkary reported that there is a 95% chance that the claimant's IQ falls in the 94-
             102 range.  Moreover, the claimant scored from 76 - 87 when tested by Dr. Riley.
19           These results are in sharp contrast [sic] to his results less than one year later.  On
             October 9, 2007, the claimant performed poorly on the Bender-Gestalt Test, as he
20           received a score of 10 (scores above 6 suggest significant impairment).  The
21           claimant's score on the Trail Making Tests reflected his slowed psychomotor
             ability, and his Full Scale IQ on the WAIS-III contains no explanation for such a
22           dramatic change in the claimant's IQ scores.  I am left to conclude that the
             extremely low scores are the result either of inadequate effort or outright
23           malingering.

24

25   AR 32-33.

26

27

28
                                                    19

United States District Court
For Northern District of California

1    The ALJ then explained that Mr. Oliver's alleged impairments did not preclude him from

2   working previously, thereby strongly suggesting that his alleged impairments would not preclude

3   him from doing so now.  AR 33.  Even though Mr. Oliver testified that he is unable to be around

4   others, the ALJ found that Mr. Oliver "has a long work history, during which he interacted with

5   co-workers and the general public."  AR 33.  The ALJ expounded that Mr. Oliver worked at

6   McDonald's for many years before he was fired for engaging in an argument with a coworker.

7   AR 33.  In addition to a long work history, the ALJ explained that nothing in the record "explains

8   any change in function attributable to a medically determinable impairment."  AR 33.  Even

9   though the ALJ acknowledged that it is plausible that Mr. Oliver's personality disorder worsened

10  over time, the record showed that it is equally plausible that Mr. Oliver's behavior was volitional.

11  AR 33.  Furthermore, the ALJ noted that being difficult and exhibiting bullying behavior alone is

12  not sufficient evidence to find mental impairment and that "it certainly appears that the claimant's

13  low IQ scores are the product of malingering."  AR 33.

14    The ALJ also evaluated Mrs. Johnson's testimony and found that it was important but did not

15  establish that Mr. Oliver was disabled or that Mr. Oliver's behavior was due to a mental

16  impairment and not volitional.  AR 33.

17    In addition to finding that Mrs. Johnson's testimony did not compel a finding that Mr. Oliver

18  is disabled, the ALJ discounted the opinion of Ms. Williams, Mr. Oliver's social worker.  AR 33.

19  Even though Ms. Williams opined that Mr. Oliver would not be able to find a job or live

20  independently, the ALJ found that Ms. Williams's record did not objectively support her

21  conclusion and only revealed her infrequent contacts with Mr. Oliver.  AR 33.  The ALJ reasoned

22  that the progress notes shows only Mr. Oliver's subjective complaints and did not provide any

23  objective evidence of cognitive impairment.  AR 33.  Citing the Federal Regulations, the ALJ

24  explained that only medical sources may render medical opinions and Ms. Williams is a social

25  worker.  AR 33.  Consequently, she was not an acceptable medical source for diagnosing

26  disorders.  AR 33.

27

28

C 11-04354 LB
ORDER

Next, the ALJ specified that he did not accord any weight to the opinion of a treating source internist that Mr. Oliver was unable to maintain employment due to poor comprehension and poor communication skills because "it lacks any objective basis in the record and ignores claimant's actual work history."  AR 28.  In according no weight to the internist's opinion, the ALJ reasoned that the opinion was not a medical opinion and it purported to opine about a matter clearly beyond the expertise of an internist.  AR 34.  The ALJ stated, "it actually purports to opine about a vocational matter, *i.e.,* about whether jobs exist for someone with poor comprehension and communications."  AR 34.

Lastly, the ALJ discussed the State Agency's opinion that the Mr. Oliver "can without difficulty understand, remember, and carry out short and simple instructions; perform activities within a schedule; main regular attendance; sustain an ordinary routine without special supervision; work in coordination with or proximity to others; and maintain socially appropriate behavior."  AR 34.

The ALJ compared the reports from Dr. Sokkary, Dr. Howard, and the State Agency.  AR 34.  In so doing, the ALJ gave greater weight to the State Agency and Dr. Sokkary than to Dr. Howard.  AR 34.  The ALJ stated:

> However, the State Agency opined he has marked limitation with respect to his ability to understand, remember, and carry out detailed instructions, and has moderate limitation with respect to his ability to maintain attention and concentration for extended periods; get along with co-workers and respond to changes in the work setting.  Dr. El-Sokkary opined the claimant demonstrates a capacity to understand, remember, and perform moderately difficult tasks and is able to maintain a sufficient level of concentration, persistence, and pace to perform basic to moderately complex work and would be able to appropriately interact with supervisors and co-workers.  On the other hand, Dr. Howard opined the claimant is likely to have marked to extreme difficulty performing detail and complex tasks, marked difficulty performing simple and repetitive tasks and difficulty working without special supervision.

AR 34.  The ALJ explained that he gave less weight to Dr. Howard's opinion because Mr. Oliver worked for several years without any special supervision and performed unskilled entry-level work that involved contact with the public and interaction with co-workers.  AR

21

34. Moreover, the ALJ reasoned that the "record does not contain evidence that the claimant now no longer can perform such work." AR 34. In addition, the ALJ reasoned that Dr. Howard's opinion was less persuasive because his opinion contrasted sharply with the other evidence in the record. AR 34. Finally, Dr. Howard did not provide a reason for the drastic differences in Mr. Oliver's scores with him as compared to Mr. Oliver's earlier scores with other psychiatrists. AR 34. Nevertheless, the ALJ gave Mr. Oliver "the benefit of the doubt" and provided certain limitations in the RFC. AR 34.

Having determined Mr. Oliver's RFC as allowing for unskilled work that requires no more than 4th grade-level reading or more than 6th grade-level math with no public contact and only occasional interaction with co-workers, the ALJ proceeded with steps four and five of the sequential evaluative process. AR 31-36.

At step four, the ALJ found that Mr. Oliver was not capable of performing his past relevant work as a security guard, DOT (# 372.667-034), and fast food worker, DOT (# 311.472-010), because, as the VE testified, both positions require public contact. AR 34.

At step five, the ALJ noted that Mr. Oliver was a "younger individual" pursuant to 20 C.F.R. § 404.1563 and that Mr. Oliver has at least a high school education and is able to communicate in English. AR 34. Furthermore, the ALJ stated that transferability of skills is not material to the determination of disability when "using the Medi-Cal Vocational Rules as a framework supports a finding that the claimant is 'not disabled'" regardless if the claimant is disabled. AR 35. The ALJ stated that he asked the VE as to "whether jobs exist in the national economy for an individual with the claimant's age, education (including some special education), work experience, and residual functional capacity." AR 35. In response, the VE testified that Mr. Oliver "would be able to perform the requirements of representative labor occupations such as" a hand packager, landscape laborer, and housekeeper. AR 35.

The ALJ thus concluded that Mr. Oliver was not disabled as defined in the Social Security Act from January 1, 2007 to the date of the ALJ's decision. AR 36.

C 11-04354 LB
ORDER

**G.  Appeals Council and New Medical Evidence it Rejected**

On February 23, 2010, Mr. Oliver timely requested the Appeals Council to review the ALJ's decision and to find that ALJ's decision was not supported by substantial evidence and was based on legal errors.  AR 17.  These legal errors included "disregarding professional and lay testimony without basis and failing to include all the claimant's impairments in the findings as to residual functional capacity."  AR 17.  While Mr. Oliver's request for review was pending before the Appeals Council, Mr. Oliver submitted new medical evidence from the Alameda County Behavioral Health Care Services (Alameda County) dated from July 13, 2010 to November 2, 2010.  Ex. A, ECF No. 12-1.  That evidence contained a new diagnosis of Asperger's Disorder.

In a denial notice dated June 24, 2011, the Appeals Council "looked at" and returned the new medical records from the Alameda County to Mr. Oliver.  AR 7.  The Appeals Council explained,

> We also looked at medical record from Alameda County Behavioral Health Care Services dated July 13, 2010 to November 2, 2010.  AR 7.  The Administrative Law Judge decided your case through February 11, 2010.  This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before February 11, 2010.

AR 2.

The Appeals Council returned Mr. Oliver's new medical records from the Alameda County. The Appeals Council accepted into the record only two items: (1) Mr. Oliver's brief requesting remand in light of new evidence and (2) an article delineating Asperger's Disorder in adults.  AR 248-65, 266-71.

On July 7, 2011, Mr. Oliver's counsel asked the Appeals Council to consider the new Alameda County medical record that "was not considered."  AR 276.  On July 26, 2011, the Appeals Council affirmed its June 2011 determination and quoted its earlier notice that the evidence was "about a later time."  AR 2.  The Appeals Council did not make the new medical records a part of the administrative record but did include in the record Mr. Oliver's counsel's July 2011 letter.  AR 1-2, 5.  The ALJ's February 11, 2010 decision thus became the Commissioner's final decision.  AR 1.

23

United States District Court
For Northern District of California

**H.  Medi-Cal Proceedings**

Mr. Oliver filed an application for Medi-Cal in January 2011 as a disabled individual, and the Alameda County denied his request for Medi-Cal because it relied on the Social Security Administration's (SSA) finding that Mr. Oliver was not disabled. Ex. B, ECF No. 13 at 4.  A SSA disability determination is binding on the state until SSA changes that determination. *Id.* at 5.  Consequently, a claimant ordinarily may not qualify for Medi-Cal unless he or she is disabled under the SSA's rule. *Id.*

In October 2011, the Medi-Cal ALJ found that an exception applied to the general rule of deference to the SSA because Mr. Oliver alleged a new or different impairment than that listed on the SSI Application. *Id.* at 3, 5.  On the SSI application, the Medi-Cal ALJ determined that Mr. Oliver's claimed impairments were Affective Mood Disorders and Organic Mental Disorders and that the Mr. Oliver was now alleging Asperger's Disorder, Borderline Intellectual Functioning, and Personality Disorder. *Id.* at 5.  When a claimant applies for Medi-Cal and alleges an impairment different from, or in addition to, the impairments considered by SSA, the county may make a decision on the claimant's disability status independent of SSA. *Id.*  Therefore, the Medi-Cal ALJ held that the county could not deny Mr. Oliver's application on the basis of SSI's determination but must conduct an independent determination of disability. *Id.*  It remanded for that consideration. *Id.*

## ANALYSIS

Mr. Oliver asks  the court to (I) review the ALJ's decision and (II) remand to the ALJ to consider (A) the new medical evidence presented to (and rejected by) the Appeals Counsel and (B) the Medi-Cal remand.  Pl.'s Mot., ECF No. 12.  The court remands for consideration of the treating internist's medical opinion, the Alameda County medical records, and the Medi-Cal remand.

## I. REVIEW OF ALJ'S DECISION

Mr. Oliver challenges the ALJ's decision on two grounds: (1) the ALJ failed to provide specific and legitimate reasons supported by substantial evidence to reject the treating internist's

C 11-04354 LB
ORDER

medical opinion; and (2) the ALJ's hypothetical did not adequately describe Mr. Oliver's limitations.  Pl.'s Mot., ECF No. 12 at 21-27.

### A.  Standard of Review

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the plaintiff initiates the suit within 60 days of the decision.  District courts may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." 42 U.S.C. § 405(g); *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  If the evidence in the administrative record supports both the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *See id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999).

### B.  Applicable Law: Five Steps to Determine Disability

An SSI claimant is considered disabled if (1) he suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A) & (B).

The Social Security regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520. The five steps are as follows:

**Step One.** Is the claimant presently working in a substantially gainful activity?  If so, then the claimant is "not disabled" and is not entitled to benefits.  If the claimant is not working in a

25

United States District Court
For Northern District of California

substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

**Step Two.**  Is the claimant's impairment (or combination of impairments) severe?  If not, the claimant is not disabled.  If so, the evaluation proceeds to step three.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).

**Step Three.**  Does the impairment "meet or equal" one of a list of specified impairments described in the regulations?  If so, the claimant is disabled and is entitled to benefits.  If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

**Step Four.**   Considering the claimant's residual functional capacity, is the claimant able to do any work that he or she has done in the past?  If so, then the claimant is not disabled and is not entitled to benefits.  If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

**Step Five.**  Considering the claimant's residual functional capacity, age, education, and work experience, is the claimant able to "make an adjustment to other work?"  If not, then the claimant is disabled and entitled to benefits.  *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do.  There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.  If the Commissioner meets this burden, the claimant is not disabled.

For steps one through four, the burden of proof is on the claimant.  At step five, the burden shifts to the Commissioner.  *See* Tackett, 180 F.3d at 1098.

26

C 11-04354 LB
ORDER

**United States District Court**
**For Northern District of California**

**C.  The ALJ Improperly Disregarded the Treating Internist's Medical Opinion**

Mr. Oliver contends that the ALJ failed to provide specific and legitimate reasons based on substantial evidence for rejecting the medical opinion of his treating physician.[3]  Pl.'s Mot., ECF No. 12 at 24-27.[4]  Specifically, he argues that the ALJ should have considered the internist's descriptions of Mr. Oliver's "chief complaint" that he "can't understand directions, gets frustrated" and her reporting of his medical limitations such as poor comprehension and poor communication skills.  *Id.* at 25; *see* AR 353-54.

When determining whether a claimant is disabled, the ALJ must consider each medical opinion in the record together with the rest of the relevant evidence.  20 C.F.R. § 416.927(b); *Zamora v. Astrue*, No. C 09-3273 JF, 2010 WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010).  "By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians."  *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527).  "The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'"  *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (citing *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).  "However, the opinion of the treating physician is not necessarily conclusive as to either the physical condition or the ultimate issue of disability."  *Id.* (citing *Magallanes*, 881 F.2d at 751 and *Rodriguez v. Bowen*, 876 F.2d 759, 761-62 & n.7 (9th Cir. 1989)).

---

[3]  Mr. Oliver does not identify his treating physician at the Native American Health Center, and the signature on the records is illegible.

[4]  A portion of the treating internist's opinion addressed Mr. Oliver's ability to maintain employment.  AR 353.  The ALJ said that he gave no weight to that opinion for three reasons: (1) it was "not a medical opinion" and therefore was beyond the internist's expertise; (2) "it lacks any objective basis in the record;" and (3) it "ignores the claimant's actual work history."  AR 28, 33-34.  Mr. Oliver concedes that the internist's opinion about his ability to maintain employment is beyond the expertise of the internist as a treating physician but argues that the limitations reported by the internist are medical opinions that the ALJ should not have rejected out of hand.  Pl.'s Mot., ECF No. 12 at 25.

United States District Court
For Northern District of California

"If a treating physician's opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight.'" *Orn*, 495 F.3d at 631(quoting 20 C.F.R. § 404.1527(d)(2)). "If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Social Security] Administration considers specified factors in determining the weight it will be given." *Id.* "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)(i)-(ii)). "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and '[o]ther factors' such as the degree of understanding a physician has of the [Social Security] Administration's 'disability programs and their evidentiary requirements' and the degree of his or her familiarity with other information in the case record." *Id.* (citing 20 C.F.R. § 404.1527(d)(3)-(6)). Nonetheless, even if the treating physician's opinion is not entitled to controlling weight, it still is entitled to deference. *See id.* at 632 (citing SSR 96-02p at 4 (Cum. Ed. 1996)). Indeed, "[i]n many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-02p at 4 (Cum. Ed. 1996).

"Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians." *Orn*, 495 F.3d at 631 (citing 20 C.F.R. § 404.1527(d)(1)-(2)); *see also* 20 C.F.R. § 404.1527(d). Accordingly, "[i]n conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th

Cir. 2008) (citing 20 C.F.R. § 404.1527).  "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence."  *Id*. (quotation and citation omitted).  "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence."  *Id*. (quotation omitted).[1]  Opinions of non-examining doctors alone cannot provide substantial evidence to justify rejecting either a treating or examining physician's opinion.  *See Morgan*, 169 F.3d at 602.  An ALJ may rely partially on the statements of non-examining doctors to the extent that independent evidence in the record supports those statements.  *Id*.  Moreover, the "weight afforded a non-examining physician's testimony depends 'on the degree to which they provide supporting explanations for their opinions.'"  *See Ryan*, 528 F.3d at 1201 (quoting 20 C.F.R. § 404.1527(d)(3)).

---

[1] Although the type of reasons needed to reject either a treating or an examining physician's opinion is the same, the amount and quality of evidence in support of those reasons may be different.  As the Ninth Circuit explained in *Lester*:

> Of course, the type of evidence and reasons that would justify rejection of an examining physician's opinion might not justify rejection of a treating physician's opinion.  While our cases apply the same legal standard in determining whether the Commissioner properly rejected the opinion of examining and treating doctors— neither may be rejected without 'specific and legitimate' reasons supported by substantial evidence in the record, and the uncontradicted opinion of either may only be rejected for 'clear and convincing' reasons—we have also recognized that the opinions of treating physicians are entitled to greater deference than those of examining physicians.  *Andrews*, 53 F.3d at 1040-41; *see also* 20 C.F.R. § 404.1527(d).  Thus, reasons that may be sufficient to justify the rejection of an examining physician's opinion would not necessarily be sufficient to reject a treating physician's opinion.  Moreover, medical evidence that would warrant rejection of an examining physician's opinion might not be substantial enough to justify rejection of a treating physician's opinion.

*Lester*, 81 F.3d at 831 n.8.

29

1   Here, the internist is a treating physician.  Nevertheless, the ALJ silently rejected the medical

2   portion of the internist's opinion and did not give deference to the opinion as required under the

3   Code of Federal Regulations.  SSR 96-2p (explaining that a treating source opinion, even if

4   inconsistent with other substantial evidence in the record, must be afforded deference and

5   weighed using all the factors listed under 20 C.F.R. § 404.1527).  The ALJ made only two

6   references to the internist's opinion in his decision, and both references concerned the sentence

7   regarding Mr. Oliver's ability to maintain employment.  AR 28, 33-34.  In the ALJ's first

8   reference to the internist's opinion, he stated:

> On May 16, 2008, an internist [signature illegible] opined that the claimant is unable to maintain employment due to poor comprehension and poor communication skills.  (I accord no weight to that opinion, as it lacks any objective basis in the record and ignores claimant's actual work history.)

AR 28 (citation omitted).

The ALJ again mentioned the internist's sentence regarding Mr. Oliver's inability to maintain

employment due to poor comprehension and communication at step four:

> On May 16, 2008, a treating source internist opined that the claimant is unable to maintain employment due to poor comprehension and poor communication skills.  However, I accord no weight to that opinion because it is not a medical opinion - it actually purports to opine about a vocational matter, *i.e.*, about whether jobs exist for someone with poor comprehension and communications.

AR 33-34 (citation omitted).

Both references explain only why the ALJ did not accord any weight to the specific sentence.

Even though the ALJ provided three reasons for according no weight to one of the internist's

sentences, the ALJ failed to provide specific and legitimate reasons that are supported by

substantial evidence about why he disregarded the medical portion of the internist's opinion.

The question then is whether the error is harmless.  The Ninth Circuit held in *McLeod v.*

*Astrue* that the harmless error rule also applies in the social security context.  640 F.3d 881, 887

(9th Cir. 2011) (noting that the Supreme Court established that administrative adjudicators are

subject to the same harmless error rule as ordinarily applied in civil cases (*citing Shinseki v.*

30

United States District Court
For Northern District of California

1   *Sanders*, 556 U.S. 406 (2009))).   An error is harmless when it is clear that the excluded evidence

2   was "inconsequential to the ultimate nondisability determination" in the context of the record as a

3   whole.  *Molina v. Astrue*, 674 F.3d 1104, 1122 (9th Cir. 2012) (citations omitted).  The plaintiff, as

4   the party attacking the agency's decision, normally bears the burden of proving that an error is

5   harmful.  *Id.* at 1111 (9th Cir. 2012) (quotation omitted).

6       The Commissioner contends that the internist's opinion regarding Mr. Oliver's poor

7   communication and comprehension skills were considered in the ALJ's RFC, thereby rendering

8   the ALJ's error harmless.  Comm'r's Opp'n and Cross-mot., ECF No. 14 at 11.  Mr. Oliver

9   counters that the ALJ's hypothetical did not include "poor comprehension or poor communication

10  skills as reported by the treating physician."  Pl.'s Reply, ECF No. 15 at 8.  These limitations, Mr.

11  Oliver contends, "impair Mr. Oliver's ability to respond appropriately to supervision and to take

12  direction."  *Id.*  As the only treating source, the internist's opinion is given controlling weight.

13  Also, the ALJ observed that the record did not contain any credible evidence demonstrating that

14  Mr. Oliver had a cognitive disorder.  AR 26.  But the treating internist in her remarks noted Mr.

15  Oliver's "cognitive delay."  AR 353.   Evidence of cognitive delay from a treating source is not

16  inconsequential to the determination that Mr. Oliver may have a cognitive disorder and --

17  especially in light of the new medical evidence -- could cause a reasonable ALJ to reach a

18  different disability determination.  *See Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055

19  (9th Cir. 2006).  The court cannot say in the context of the record as a whole that the ALJ's

20  disregard of the medical portion of the internist's opinion was harmless or "inconsequential to the

21  ultimate nondisability determination."  *See Molina*, 674 F.3d at 1122.

22      Here, the record contains reasons to discount the internist's medical opinion but the court

23  cannot provide post-hoc rationalizations for the ALJ's decision.  *See* SEC *v. Chenery Corp.,* 332

24  U.S. 194, 196 (1947).  Therefore remand to the agency with instructions to conduct a proper

25  inquiry into the internist's medical opinion is appropriate.

26

27

28

C 11-04354 LB
ORDER

### D. Plaintiff's Hypotheticals

Mr. Oliver does not contend that the ALJ's RFC is not supported by substantial evidence but contends that the ALJ's hypothetical under step five of the five-step sequential process failed to include limitations regarding his "ability to take direction, ability to act appropriately, or ability to deal with stress which were clearly demonstrated in the record."  Pl.'s Mot., ECF No. 12 at 23.

At step five, if (considering residual functional capacity, age, education, and work experience) the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do.  20 C.F.R. § 404.1520(a)(4)(v). The Commission may sustain its burden at step five by posing hypothetical questions to a vocational expert that are based on a claimant's residual functional capacity.  The vocational expert may give evidence about jobs that a hypothetical employee with the same residual functional capacity as the claimant would be able to perform.  *See* 20 C.F.R. § 404.1520(g).  A vocational expert's recognized expertise provides the necessary foundation for his or her testimony, and no additional foundation is required.  *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217-18 (9th Cir. 2005).  The hypothetical questions must be based on a RFC for which there exists substantial support in the record.  *See Magallanes*, 881 F.2d at 756-57.

Mr. Oliver does not contend that the ALJ erred in determining his RFC.  The hypothetical question is based on and reflects this RFC: an individual who cannot perform his past relevant work but could perform unskilled work that requires no more than 4th grade-level reading or more than 6th grade-level math with no public contact and only occasional interaction with co-workers.  In contending that the ALJ erred by failing to include three other limitations (the ability to take directions, act appropriately, or deal with stress), Mr. Oliver emphasizes the VE's answers to three of the four hypotheticals that he posed (and that are summarized above in the Statement).

An ALJ is not bound to accept as true the limitations presented in a hypothetical question that a claimant's counsel posed.  *Magallanes*, 881 F.2d at 756 (citing *Martinez v. Heckler*, 807 F.2d 771, 773 (9th Cir. 1986)).  An ALJ has the discretion to accept or reject limitations posed in a hypothetical question if such limitations are not supported by substantial evidence.  *Osenbrock v. Apfel*, 240 F.3d 1157, 1164-65 (9th Cir. 2001) (citing *Magallanes*, 881 F.2d at 756-57).

United States District Court
For Northern District of California

Mr. Oliver's argument here really is that the limitations that the ALJ did not consider are more obviously supported by the Alameda County medical records and the diagnosis of Asperger's Disorder.  The ALJ did not have access to that medical evidence.  In the next section, the court remands for consideration of it.  It is true that the record already has evidence or opinions supporting the three limitations that Mr. Oliver proposed, but the ALJ's crediting of the evidence and opinion may change based on the new evidence.  Thus, on remand, the ALJ should consider the three limitations: (1) marked impairment with the usual stresses encountered in competitive employment; (2) special services to help appropriate communication with coworkers and supervisors; and (3) marked impairment in taking directions.

To illustrate how the analysis of the limitations might change on remand, the court summarizes the evidence in the record about the three limitations.

### 1. Marked Impairment with Usual Stressors

As to marked impairment with usual stressors, Dr. Howard opined that Mr. Oliver has difficulties performing work activities without special or additional supervision and difficulties with the usual stresses encountered in competitive work.  AR 19.  Dr. Howard is an examining doctor, and the ALJ specifically stated that he was providing less weight to Dr. Howard's opinion than to Dr. Sokkary and the "State Agency" because it might not be an accurate representation of Mr. Oliver.  AR 32-34.  The ALJ explained that Dr. Howard's test results contrasted sharply with the other medical evidence in the record.[5]  Therefore, the ALJ gave less weight to the opinion of

---

[5]   For example, in September 12, 2006, Mr. Oliver completed a cognitive assessment and obtained the following scores: a Full Scale IQ of 79, Verbal IQ of 76, a Performance IQ of 87, Perceptual/ Organization Index of 93, and Verbal Comprehension Index of 78.  AR 328.  In addition, under Dr. Sokkary on September 25, 2006, Mr. Oliver obtained the following WAIS-III scores: Full Scale IQ of 98, Verbal IQ of 89, and Performance IQ of 111.  AR 291.  In less than one year on October 9, 2007, the ALJ found that Mr. Oliver performed poorly on the WAIS-III scale with Dr. Howard and obtained the following scores: Full Scale IQ of 62, Verbal IQ of 66, and Performance IQ of 63.  AR 312.  The ALJ found that nothing in the record accounted for the significant change in the scores.  AR 33; *See* AR 48 (replying to the ALJ, Mr. Oliver's counsel stated that there are no medical or psychiatric evidence indicating a change in function in Mr. Oliver).

Mr. Howard, because "[t]he claimant's responses during psychiatric testing raise the possibility that the claimant was not putting forth maximal effort, was malingering or was not fully cooperating" and may indicate that Mr. Oliver putting "inadequate effort" into the assessment. AR 32-33.

In addition, the ALJ reasoned that Dr. Howard did not explain the difference in his test results as compared to earlier scores with other physicians.  AR 34.  The ALJ also noted that Dr. Sokkary and Dr. Riley did not conclude that Mr. Oliver had "psychological restrictions on his ability to work."  AR 32.  In addition to finding that Dr. Howard's opinion should be afforded less weight, the ALJ reasoned that Mr. Oliver was able to work for several years, performing unskilled entry-level work at McDonald's.  AR 333.  Furthermore, prior to his position at McDonald's, Mr. Oliver worked as a security guard and driver from 1986 to 1991.  AR 218.  Therefore, the ALJ concluded that Mr. Oliver's past work experience showed that he was capable of handling the usual stresses of competitive employment.

The new medical records about the Asperger's Disorder are relevant to this analysis.

### 2. Need for Special Services for Communication with Coworkers and Supervisors

The ALJ's hypothetical was limited to "only occasional interaction with co-workers."  AR 31.  Mr. Oliver points to Dr. Yoos's[6] opinion that Mr. Oliver requires retention services "to help with how to communicate appropriately with co-workers and supervisors and how to handle conflict in

---

[6]  Even though Dr. Yoos is a vocational evaluator who generated a Vocational Evaluation and Career Planning Report, the ALJ found Dr. Yoos's opinion most compelling, as compared to the other psychological or medical examination, on her finding that Mr. Oliver scored above to above average range in cognitive reasoning and "did not demonstrate any challenges with his cognitive processing."  AR 26.  Mr. Oliver argues that the ALJ failed to consider other aspect of Dr. Yoos's report that indicated that Mr. Oliver is argumentative, very opinionated, has a difficult time listening, and requires retention services to learn how to communicate.  Pl.'s Mot., ECF No. 12 at 18.  The Commissioner argues that Dr. Yoos's opinion should not be given more weight than the opinions of the other medical doctors in the record because she "is not an acceptable medical source."  Comm'r's Opp'n and Cross-mot., ECF No. 14 at 9.  In light of the new evidence, the ALJ can consider whether he should provide more weight to Dr. Yoos's opinion than to the opinions of the other psychologists or doctors who examined Mr. Oliver.

34

United States District Court
For Northern District of California

1   an effective manner and how to work with those who are from a different culture."  Pl.'s Mot.,

2   ECF No. 12 at 22.

3          There is a mix of information in the record.  Dr. Sokkary opined that Mr. Oliver was

4   "cooperative throughout the evaluation and was capable of adequately communicating and

5   therefore would be able to appropriately interact with supervisors and co-workers."  AR 292.  At

6   the hearing, the VE indicated that "special services" would be "considered accommodating work"

7   and therefore, he did not believe it would be possible for the individual to do substantial gainful

8   work.  AR 77.  Also, despite Dr. Yoos's acknowledgement that Mr. Oliver has trouble with

9   communication and interpersonal skills, she nevertheless found that "Mr. Oliver is capable of

10  working in jobs such as the ones he has had in the past, he can stock shelves, and he would be a

11  good candidate for the Good Will, Thrift Town, or the Salvation Army where he can pick items,

12  sort them and organize them in the store."  AR 192.  Mr. Oliver's sister testified about his

13  problems.  AR 65-69.  Given the ALJ's concern about the difficulties of determining whether Mr.

14  Oliver's behaviors were volitional or a result of his mental impairments, the new information will

15  affect the ALJ's assessment.

16          **3.  *Marked Impairment in Taking Directions***

17          The VE interpreted "a marked impairment in taking directions" as a "severe problem that

18  would require the individual to be in a special vocational setting that was more supervised than

19  standard employment" and found that it would not be possible for the individual to be employed.

20  AR 77.  In determining Mr. Oliver's RFC, the ALJ found that Mr. Oliver was able to "understand,

21  remember, and carry out short and simple instructions" without difficulties.  AR 34.  In addition

22  to the State Agency's opinion, the ALJ also considered Dr. Sokkary's remark indicating that "Mr.

23  Oliver demonstrates a capacity to understand, remember, and perform moderately difficult tasks

24  and is able to maintain a sufficient level of concentration, persistence, and pace to perform basic

25  to moderately complex work."  AR 34.  The State Agency opined that Mr. Oliver has marked

26  limitation with respect to his ability to understand, remember, and carry out *detailed* instructions,

27

28

35

C 11-04354 LB
ORDER

United States District Court
For Northern District of California

1    and has moderate limitation with respect to his ability to maintain attention and concentration for

2    extended periods.

3        On appeal, Mr. Oliver points out that the hypothetical did not include the internist's opinion

4    pertaining to Mr. Oliver's "anger management issues" and "poor comprehension skills" or Dr.

5    Cotrufo's finding that Mr. Oliver has "reactive anger, a demanding style requiring almost perfect

6    respect, sensitivity, and a tendency to work himself into a spiral of angry entitlement out of fear of

7    being overwhelmed with confusion, and a threatening demeanor."  Pl.'s Reply, ECF No. 15 at 8.

8        Again, the ALJ on remand will be able to consider this limitation in light of all the evidence,

9    including the new evidence.

## II.   REMAND TO ALJ TO CONSIDER NEW MEDICAL INFORMATION

11       Mr. Oliver asks the undersigned to remand so that the  ALJ may consider (A) medical records

12   of a diagnosis of Asperger's Disorder presented to (and rejected by) the Appeals Council and (B)

13   the Medi-Cal remand that occurred after the final decision here.

### A.   New Medical Records Concerning a New Diagnosis of Asperger's Disorder

15       Mr. Oliver contends that the Appeals Council erred by refusing to consider the medical

16   records from Alameda County regarding the diagnosis of Asperger's Disorder.  The court agrees

17   and remands to the ALJ to consider the evidence.

18       The Appeals Council considers new and material evidence only if it relates to the period on or

19   before the date of the ALJ's decision.  20 C.F.R. § 404.970(b).  A claimant is not required to show

20   "good cause" (and the government does not argue that it must).  *See Brewes v. Comm'r of Soc.*

21   *Sec. Admin.*, 682 F.3d 1157, 1162 (9th Cir. 2012).  In considering the evidence, the Appeals

22   Council "shall evaluate the entire record including the new and material evidence submitted."  20

23   C.F.R. § 404.970(b).  The Appeals Council will grant a claimant's request for review "if it finds

24   that the administrative law judge's action, findings, or conclusion is contrary to the weight of the

25   evidence currently of record."  *Id.*   If a claimant submits evidence that does not relate to the

26   period on or before the date of the ALJ's decision, the Appeals Council will return the new

27

28

36

C 11-04354 LB
ORDER

1    evidence to the claimant with an explanation as to why it did not accept the new evidence and

2    advise the claimant of his or her right to file a new application.  20 C.F.R. § 416.1476(b)(1).

3        New evidence is material if it bears "directly and substantially on the matter in dispute" and

4    the petitioner demonstrates a "reasonable possibility" that the new evidence would have changed

5    the outcome of the administrative hearing.  *Luna v. Astrue*, 623 F.3d 1032, 1034 (9th Cir. 2010)

6    (citations omitted).

7        Here, the Appeals Council considered and rejected the evidence as "about a later time" in

8    denying Mr. Oliver's request for review.  AR 2.  Thus, the court may consider the evidence in

9    determining whether the Commissioner's decision is supported by substantial evidence.  *See*

10   *Taylor v. Commissioner of Soc. Sec. Admin.,* 659 F.3d 1128, 1232 (9th Cir. 2011); *Lingenfelter v.*

11   *Astrue*, 504 F.3d 1028, 1030 (9th Cir. 2007); *Ramirez v. Shalala,* 8 F.3d 1449, 1452 (9th Cir.

12   1993); *Harman v. Apfel,* 211 F.3d 1172, 1180 (9th Cir. 2000)). [7]  As in *Ramirez*, "the government

13   does not contend that the Appeals Council should not have considered the additional report

14   submitted after the hearing or that this court should not consider it on appeal."  *See* 8 F.3d at

15   1451-52; *accord Brewes v. Commissioner of Social Security Administration*, 682 F.3d at 1159-60.

16       Mr. Oliver asks the court to credit the evidence as true because the evidence was improperly

17   rejected by the Appeals Council.  *See* Pl.'s Mot., ECF No. 12 at 15-20.  He contends that the

18   Appeals Council's conclusion that the medical evidence was "about a later time" (meaning, about

19   a time after the time period relevant to the ALJ's decision) is illogical because the evidence is

20   related to the time period that the ALJ considered.  *Id.* at 16.

21       The Commissioner does not contest that the medical records from Alameda County relate to a

22   period after the date of the ALJ's decision.  Comm'r's Opp'n and Cross-mot., ECF No. 14; *see*

23   *Taylor,* 659 F.3d at 1232.  Instead, the Commissioner argues that "even if the Appeals Council's

24   reason was not entirely accurate, the evidence was, nevertheless, immaterial because there is no

25   reasonable possibility that it would change the ALJ's decision."  *Id.* at 8.  In support of its

26

27   [7]  The Appeals Council's denial of review is not the final agency action; instead, the denial means
     that the ALJ's decision is the final decision.  *Brewes*, 659 F.3d at 1161.

28

C 11-04354 LB
ORDER

conclusion that the diagnosis is not material, the Commissioner argues that even though there is a new diagnosis, the symptoms are the same, and thus it naturally follows that the RFC and the hypothetical based on the RFC remain unchanged.  *Id.* at 5.

First, the court agrees that the administrative record before the ALJ addressed the same symptoms that are addressed in the Alameda County medical records, which thus are related to the period before the ALJ.  As Mr. Oliver argues, Asperger's Disorder is "a developmental disorder, not a condition which suddenly appeared after hearing."  Pl.'s Mot., ECF 12 at 20.  Furthermore, Mr. Oliver demonstrated that the symptoms that Dr. Watkins and Dr. Cotrufo reported in the Alameda County records as indicative of Asperger's Disorder were similar or present in the record before the ALJ.  *Id.*  In diagnosing Mr. Oliver with Asperger's Disorder, Dr. Watkins reported the following symptoms:

> He endorsed checking rituals and having routines.  He has a rigid structure.  Entitled.  Easily Frustrated.  He acknowledged getting angry at people who doesn't understand him.  He said he thinks they are stupid and gets mad.  He [was] denied SI but said he would suicide, if doesn't get SSI.

Ex. A, ECF No. 12-3 at 6.

In addition to Dr. Watkins's list of symptoms, Dr. Cotrufo pointed to Mr. Oliver's idiosyncratic social response and act of touching the neck of his shirt, stretching it, and then putting it in his mouth as consistent with Asperger's Disorder.  Ex. A, ECF No. 12-4 at 5.  Similar to Dr. Watkins, Dr. Riley noted that Mr. Oliver "may have a sense of entitlement" and is a rigid individual.  AR 331.  The record also shows that Dr. Yoos observed that Mr. Oliver "ha[s] a tic of sorts; he pulls on the back and front of the neck of his tee shirt when he is talking."  AR 184.

Drs. Cotrufo's and Watkins's opinions do not contradict the record before the ALJ but instead indicate similar symptoms that they attribute to Asperger's Disorder.

Second, the court concludes that the medical records are material.  They explain Mr. Oliver's conflicting medical results and misbehaviors.  The ALJ discredited testimony and opinions based on his view that the evidence was in conflict, and the new records change the analysis (particularly in light of the observations by the treating internist).  In turn, this supports a different

38

1  RFC and hypothetical.  More specifically, the ALJ observed that it is plausible that Mr. Oliver's

2  personality disorder had worsened over time and found it equally plausible that Mr. Oliver's

3  behavior is volitional.  AR 33.  Furthermore, the ALJ noted that being difficult and exhibiting

4  bullying behavior is not sufficient evidence to find mental impairment and observed that "it

5  certainly appears that the claimant's low IQ scores are the product of malingering."  AR 33.  As a

6  result, the ALJ provided less weight to Dr. Howard's opinion and found that Ms. Johnson's

7  testimony did not explain the "vast differences in the various assessments summarized herein."

8  AR 33.

9      The new medical records present an explanation and address the precise situation that the ALJ

10  tried to reconcile:  Mr. Oliver's conflicting testing results and his misbehaviors in recent years.[8]

11  Dr. Cotrufo opined that Mr. Oliver's intelligence level is "adequate although his ability to perceive

12  is worsened by SED Childhood and repeated negative judgements [sic] in absence of his autism

13  being diagnosed."  Ex. A, ECF No. 12-4 at 5.  Dr. Cotrufo's opinion supports the conclusion that

14  Mr. Oliver's behavior is not volitional but instead is a consequence of his Asperger's Disorder's

15  remaining undiagnosed.

16      In light of this explanation, Dr. Howard's opinion and the limitations that Mr. Oliver

17  mentioned in his testimony have more significance.[9]  Dr. Howard opined that Mr. Oliver has

18

19  _____

20  [8]  Patients with Asperger's Disorder "typically have 'special interests' that may seem unusual
    because of their subject matter or the intensity with which patients pursue them.  Asperger's
    patients are also often fixated on ensuring that their external environment and daily routines
21  remain constant; sudden changes may exceed their coping mechanisms."  AR 266.

22  [9]  Mr. Oliver contends that the new evidence showing a diagnosis of Asperger's Disorder from
23  Alameda County demonstrates that his claim should have been considered under listing 12.10 of
    20 CFR 404 subpart P, Appendix 1.  The ALJ considered Mr. Oliver's claim under 12.02 , 12.04,
24  12.05, 12.08, and 12.09 and concluded that Mr. Oliver did not have an impairment or combination
    of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404,
25  Subpart P, Appendix 1; however, the ALJ did not consider Mr. Oliver's claim under 12.10.  AR
    29-30.  It may be -- as the government suggests -- that Mr. Oliver would not be able to satisfy
26  listing 12.10 because Mr. Oliver would not be able to satisfy Part B of 12.10.  Part B requires Mr.
27  Oliver to satisfy two of the following categories: (1) marked restriction of activities of daily
    living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in
28

C 11-04354 LB
ORDER

1    marked difficulty performing simple and repetitive tasks, and the VE testified that this would

2    render such an individual unable to perform substantial gainful work.  AR 313; AR 77.

3          Thus, the court remands the new medical evidence to the ALJ to consider.

4        **B.  Medi-Cal Decision**

5          The last issue is whether the court may remand the Medi-Cal opinion so that the ALJ may

6    consider it.

7          Under 20 C.F.R. § 404.1504, another governmental agency's determination that a person is

8    disabled is not binding on the SSA because the SSA makes disability determinations based on

9    Social Security law.  A state agency's finding of disability may be introduced into evidence before

10   the Secretary, but the Secretary may attribute as much or as little weight to it as the Secretary

11   deems appropriate.  *Wilson v. Heckler*, 761 F.2d 1383, 1385 (9th Cir. 1985).   Also, the

12   Commissioner must "evaluate all the evidence in the case record that may have a bearing on our

13   determination or decision of disability, including decisions by other governmental and

14   nongovernmental agencies."  SSR 06-03p (citing to 20 CFR § 404.1512(b)(5) and 416.912(b)(5)).

15   Therefore, "evidence of a disability decision by another governmental or nongovernmental

16   agency cannot be ignored and must be considered."  *Id.*

17         Medi-Cal is a state agency within the State of California.  Pursuant to 20 C.F.R. § 404.1504

18   and *Wilson*, an ALJ may consider the determination as evidence, but the ALJ is not bound by the

19   decision of the state agency and is not required to consider the state agency's determination in

20   making its own finding regarding Mr. Oliver's disability.  The Medi-Cal ALJ also made clear its

21   deference to the SSA.  Ex. B, ECF No. 13, at 5.  It is appropriate for the ALJ to consider Medi-

22   Cal's opinions in a determination about a claimant's disability status.

23         The Medi-Cal decision was issued after the Appeals Council's denial notice.  Under the sixth

24   sentence of 42 U.S.C. § 405(g), courts may remand for consideration of new evidence if the new

25   evidence is material and good cause exists for failing to incorporate the evidence into the record

26   _____

27   maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each
     of extended duration.  The court leaves that determination to the ALJ in the first instance.

28
                                              40

United States District Court
For Northern District of California

1    in a prior proceeding.  *Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002); *Brewes,* 682 F.3d

2    at 1164 (holding that section 405(g) "applies only to new evidence that is not a part of the

3    administrative record").

4         Here, the Commissioner did not contest good cause.  Furthermore, good cause "often is

5    liberally applied, where, as in the present case, there is no indication that a remand for

6    consideration of new evidence will result in prejudice to the Secretary."  *Burton v. Heckler*, 724

7    F.2d 1415, 1417-18 (9th Cir. 1984).  As for materiality, under all of the circumstances of the case,

8    the court cannot say it is not material (even though it recognizes that the Medi-Cal decision was

9    only a remand to the county for an independent determination).  Accordingly, the court remands

10   for consideration of this evidence too.

11        **C.  Remand for Consideration (As Opposed to Awarding Benefits)**

12        It is within the court's discretion to remand a case either for further administrative proceedings

13   or for an award of benefits.  *See McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  Here,

14   the record is not developed fully, and the court thus remands to the ALJ.

15                                        **CONCLUSION**

16        The court **GRANTS** Mr. Oliver's motion for summary judgment, **DENIES** the

17   Commissioner's cross-motion for summary judgment, and **REMANDS** this case to the

18   Administrative Law Judge to consider the treating internist's medical opinion, the Alameda

19   County medical records, the Medi-Cal opinion, and how these affects the limitations of the

20   hypothetical.

21        This disposes of ECF Nos. 12 and 14.

22   **IT IS SO ORDERED.**

23   Dated: January 16, 2012

24

25                                        _____

26                                        LAUREL BEELER
                                          United States Magistrate Judge
27

28

                                          41

C 11-04354 LB
ORDER